

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00062-CV
_____


IN THE INTEREST OF S.L.W., A CHILD



On Appeal from the County Court at Law No. 1
Gregg County, Texas
Trial Court No. 2015-2179-CCL1



Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

# OPINION

On November 23, 2015, in the County Court at Law No. 2 of Gregg County, Texas (CCL2), the Department of Family and Protective Services (Department) filed a petition to terminate Allen and Alice's parental rights to their daughter, Sally.[1] On May 1, 2017, the County Court at Law No. 1 of Gregg County, Texas (CCL1), entered an order terminating Mother's and Father's parental rights to Sally and naming the Department as Sally's permanent managing conservator.

On appeal, both parties initially argue that the CCL1 lacked jurisdiction over this dispute. In addition, Allen argues that the trial court erred in finding that (1) Allen engaged in conduct or knowingly placed Sally with persons who engaged in conduct which endangered her physical or emotional well-being, (2) Allen failed to comply with the provisions of a court order that established the actions necessary for him to obtain Sally's return after she was left in conservatorship of the Department for not less than nine months as a result of her removal for abuse or neglect, (3) termination of Allen's parental rights was in Sally's best interest, and (4) Sally's foster parents' petition for intervention should not be struck. *See* TEX. FAM. CODE ANN. §161.001(b)(1)(E), (O), (2) (West Supp. 2016). Alice argues that the judge of the CCL2 erred in signing the final order before counsel had an opportunity to object to her assignment to this case by the Honorable Mary Murphy, the presiding judge of the First Administrative Judicial Region of Texas.[2]

---

[1]We assign pseudonyms to the parties involved in order to protect the identity of the child. *See* TEX. R. APP. P. 9.8.

[2]Alice does not challenge the trial court's determination that grounds existed to terminate her parental rights or that termination of her parental rights was in Sally's best interest.

We find that (1) the CCL1 had jurisdiction over the Department's petition, (2) termination of Allen's parental rights to Sally was supported by legally and factually sufficient evidence, (3) the trial court did not abuse its discretion in failing to strike the foster parent's petition in intervention, and (4) Alice did not preserve any complaint about Judge Simpson hearing this case. Accordingly, we affirm the trial court's judgment.

## I.    The CCL1 Had Jurisdiction Pursuant to a Proper Transfer from the CCL2

When the Department initially filed its petition in the CCL2, the case was docketed under cause number 2015-2179-CCL2. On December 10, 2015, the judge of the CCL2 made a docket sheet entry stating that the case had been transferred to the CCL1. The CCL2 also notified the parties that a status hearing would be held in connection with a new cause number, 2015-2179-CCL1, in the CCL1. From that point on, the judge of the CCL1 presided over status and permanency hearings.

Prior to the expiration of the one-year deadline to commence trial on the merits under Section 263.401 of the Texas Family Code, the CCL1 entered an order extending the deadline by 180 days to May 27, 2017. *See* TEX. FAM. CODE ANN. § 263.401(b) (West Supp. 2016). Confusion arose during the pendency of the case because (a) parties continued to file documents in the CCL2 case, (b) parties filed documents in the CCL1 using the CCL2 cause number, and (c) the CCL1 issued orders using the CCL2 caption and cause number. To ease the confusion, Sally's foster parents, who had intervened in the suit, filed a motion in the CCL2 to transfer the case to the CCL1. Their motion was filed on March 17, 2017, which was well after the one-year deadline, but before the expiration of the 180-day extension that had already been granted by the CCL1. Following a

3

hearing, on April 4, 2017, the CCL2 entered a written order transferring the case to the CCL1. After a trial on the merits, the CCL1 entered an order terminating Allen and Alice's parental rights to Sally.

Allen filed a motion for new trial and argued (among other things) that the CCL1 lacked jurisdiction to decide the case. Specifically, Allen argued (a) that the one-year deadline passed, (b) that the CCL2's transfer order was signed after the expiration of the one-year deadline, and (c) therefore, that the CCL1 had no jurisdiction to enter its prior order extending the deadline by an additional 180 days. Because Section 263.401(a) of the Texas Family Code requires dismissal of cases unless a trial court commences trial on the merits within the one-year deadline or unless a proper extension is made, Allen argued that the Department's petition should have been dismissed. On appeal, Allen raises these same arguments.

The Texas Supreme Court has explained that "although subsection 263.401(a) provides for what is called the 'one-year dismissal date' and subsection 263.401(b) provides for a 180-day extension of that one-year dismissal date (if the trial court finds that certain circumstances exist), nothing in the language of section 263.401 indicates that these deadlines are jurisdictional." *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 642 (Tex. 2009). In issuing its opinion, the Texas Supreme Court noted that Section 263.401 "merely states that the trial court 'shall dismiss the suit' and 'may not retain the suit on the court's docket' when the deadlines expire." *Id.* (quoting TEX. FAM. CODE ANN. § 263.401(a), (b)). Section 263.402 of the Texas Family Code specifically states,

> A party to a suit under this chapter who fails to make a timely motion to dismiss the suit under this subchapter waives the right to object to the court's failure to

4

dismiss the suit.  A motion to dismiss under this subsection is timely if the motion is made before the trial on the merits commences.

TEX. FAM. CODE ANN. § 263.402 (West 2014).  No motion to dismiss was filed prior to the entry of the final order on the merits, and, in any event, the Texas Supreme Court has decided that the "deadlines are [not] jurisdictional."  *Id.*[3]

Moreover, Allen's argument that the CCL1 lacked jurisdiction in this case until the CCL2 entered its formal transfer order on April 4, 2017, also fails.  The docket sheet stated that the judge of the CCL2 had already transferred the case to the CCL1 on December 10, 2015.  Allen argues that Rule 330(e) of the Texas Rules of Civil Procedure does not permit the exchanges of benches in this case.[4]  We agree.  The authority for the exchange of benches in this case was provided under Section 74.121(a) of the Texas Government Code, which states,

---

[3]The parties also argue that the CCL2 had continuing, exclusive jurisdiction in this matter.  "[A] court acquires continuing, exclusive jurisdiction . . . in connection with a child on the rendition of a final order."  TEX. FAM. CODE ANN. § 155.001(a) (West Supp. 2016).  "Unless a final order has been rendered by a court of continuing, exclusive jurisdiction, a subsequent suit shall be commenced as an original proceeding."  TEX. FAM. CODE ANN. § 155.001(d) (West Supp. 2016).  The appellate record in this case demonstrates that no other court had entered a final order in a suit-affecting the parent-child relationship with respect to Sally.  Thus, prior to the entry of the order of termination of Allen's and Alice's parental rights, no other court had continuing, exclusive jurisdiction.

[4]Rule 330(e) states,

Where in such county there are two or more district courts having civil jurisdiction, the judges of such courts may, in their discretion, exchange benches or districts from time to time, and may transfer cases and other proceedings from one court to another, and any of them may in his own courtroom try and determine any case or proceeding pending in another court without having the case transferred, or may sit in any other of said courts and there hear and determine any case there pending, and every judgment and order shall be entered in the minutes of the court in which the case is pending and at the time the judgment or order is rendered, and two (2) or more judges may try different cases in the same court at the same time, and each may occupy his own courtroom or the room of any other court.  The judge of any such court may issue restraining orders and injunctions returnable to any other judge or court, and any judge may transfer any case or proceeding pending in his court to any other of said courts, and the judge of any court to which a case or proceeding is transferred shall receive and try the same, and in turn shall have power in his discretion to transfer

5

> The judges of constitutional county courts, statutory county courts, justice courts, and small claims courts in a county may transfer cases to and from the dockets of their respective courts, except that a case may not be transferred from one court to another without the consent of the judge of the court to which it is transferred and may not be transferred unless it is within the jurisdiction of the court to which it is transferred. The judges of those courts within a county may exchange benches and courtrooms with each other so that if one is absent, disabled, or disqualified, the other may hold court for him without the necessity of transferring the case. Either judge may hear all or any part of a case pending in court and may rule and enter orders on and continue, determine, or render judgment on all or any part of the case without the necessity of transferring it to his own docket. . . .

TEX. GOV'T CODE ANN. § 74.121 (West 2013). No motion or hearing is necessary to transfer a case pursuant to Section 74.121 of the Texas Government Code. *See Davis v. Davis*, No. 13-01-707-CV, 2003 WL 21355239, at \*1 (Tex. App.—Corpus Christi June 12, 2003, no pet.) (mem. op.). Thus, we find that the case was properly transferred to the CLL1 on December 10, 2015.

## II. Sufficient Evidence Supports Termination of Allen's Parental Rights

### A. Standard of Review

We strictly scrutinize termination proceedings in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). To terminate an individual's parental rights to his child, clear and convincing evidence must show: (1) that the parent has engaged in one of the statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2016); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex.

---

any such case to any other of said courts and any other judge may in his courtroom try any case pending in any other of such courts.

TEX. R. CIV. P. 330.

6

2002). The clear and convincing burden of proof has been defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *C.H.*, 89 S.W.3d at 23; *see* TEX. FAM. CODE ANN. § 101.007 (West 2014). Due process demands this heightened standard. *E.N.C.*, 384 S.W.3d at 802 (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)).

In a legal sufficiency review, termination findings are given appropriate deference. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.). In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume that the disputed facts were resolved in favor of the findings if a reasonable fact-finder could do so. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573. Conversely, we disregard evidence that a fact-finder may have reasonably disbelieved or testimony from witnesses whose credibility may reasonably be doubted. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573.

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be

clear and convincing and determine whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* (internal quotation marks omitted) (alteration and omission in original) (quoting *H.R.M.*, 209 S.W.3d at 109; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *J.F.C.*, 96 S.W.3d at 264, 266. "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "[I]n making this determination, we must undertake an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (internal quotation marks omitted) (alteration in original) (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014)).

**B.      Sufficient Evidence Supported Ground E Finding Against Allen**

Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).

The trial court found that Allen knowingly engaged in conduct or knowingly placed Sally with persons who engaged in conduct which endangered Sally's physical or emotional well-being. We examine this finding for legally and factually sufficient evidence. Despite the profound

constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *A.V.*, 113 S.W.3d at 361 (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

Under Ground E, the term endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *E.N.C.*, 384 S.W.3d at 803). "It means to 'expose to loss or injury.'" *Id.* (quoting *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.)). Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *Id.* (quoting *N.S.G.*, 235 S.W.3d at 366–67). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* (quoting *N.S.G.*, 235 S.W.3d at 366–67). "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). "However, termination under this ground 'must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez*, 148 S.W.3d at 436).

9

### 1. The Evidence at Trial

Sally was born to Alice and Allen in September 2015. The family lived in Allen's residence, which was infested with fleas after Sally was brought home from the hospital.[5] The evidence at trial established that Alice was a drug user who could not overcome her addiction, even after the Department filed this case in December 2015. Sally was removed from Alice and Allen when she was eight weeks old.

Alma Gaviria, a Child Protective Services (CPS) caseworker, testified that in January 2016, Alice admitted that she had relapsed and was again taking methamphetamine. Gaviria further testified that Alice was also hooked on morphine and had overdosed on the drug on June 22, 2016. According to Gaviria, in October 2016, Alice was living with Allen and again admitted that she was on drugs. As a result of her addictions, Gaviria testified that Alice lacked basic parenting skills.

Allen, who was still married to Alice at the time of trial, testified that she suffered from hallucinations and had attempted to commit suicide several times. Allen testified that he could not trust Alice with Sally and that he had "problems" keeping Sally away from Alice while she was using methamphetamine. Caseworkers testified that they were concerned about Allen and Alice's relationship because Alice had again become pregnant with Allen's child, was still using drugs, and was living with Allen until a month before trial. Allen admitted that he was concerned that Alice used methamphetamine during the pendency of this case while she was pregnant with his child.

---

[5]Allen resolved the flea problem and testified that Sally had never been bitten.

10

Yet, the fact that Allen had left Sally with Alice while she was using drugs was not the only reason the trial court made a finding that Allen's parental rights should be terminated under Ground E. The evidence at trial established that Allen has bi-polar disorder and a lengthy history of domestic abuse. In 2007, Allen punched Gloria Thomas in the eye, cut her cheek, and dragged her from her car by her hair, knocking over her infant daughter, all while under the influence of drugs. He was placed on community supervision for this family violence assault. In 2012, a trial court entered a protective order against Allen in favor of his then-girlfriend. Around that time, Allen entered a drug rehabilitation program, and the evidence established he remained sober since then.

However, Allen's sobriety did not extinguish his temper. On August 6, 2015, Allen was convicted of family violence assault against Alice, who was pregnant with Sally, and he was sentenced to community supervision for a period of fifteen months.[6] Ocie Ellison, formerly a caseworker with the Department, testified that Alice said Allen had tried to choke her while he was holding Sally and threatened to beat her within an inch of her life. According to Ellison, the Department arranged for Alice and Sally to go to the Highway 80 Rescue Mission, but Sally was removed from Allen and Alice's care when Alice had to be taken to the hospital by ambulance. On March 28, 2016, police went to Allen's house to investigate reports of domestic violence against Alice. During the pendency of this case, Alice kept returning to Allen. Gaviria was concerned because she believed Alice was a "trigger" for Allen's violent behavior, but that the

---

[6]Allen's community supervision officer testified that he had been placed on community supervision twice before for assault.

11

couple was still married. Kelsey Drennan, a CPS investigator, testified that there were indications that Allen was not taking his medications as prescribed.

Allen was provided with counseling services and completed a Batterer's Intervention Prevention Program (BIPP) on August 22, 2016. Yet, there was some evidence that even after completing BIPP, Allen assaulted Alice again. Erik Cunningham, an officer with the Longview Police Department, testified that Alice came into the police department on October 23, 2016, to report that Allen had choked her. Cunningham testified that Alice had injuries indicating that she had been choked. Laroyce Johnson, an officer with the Longview Police Department, was dispatched to arrest Allen. According to Johnson, Allen admitted that he had "made a mistake," "messed up," and put his hands on Alice. Johnson arrested Allen when he "started to give off a little aggression." As a result of that arrest, the State filed a motion to revoke Allen's community supervision, but it was modified instead.

Allen testified that he was still on community supervision, admitted that he had assaulted Alice while she was pregnant, and agreed that witnessing domestic violence could have a negative emotional effect on Sally. Allen testified that he received carbamazepine and Abilify to treat his bipolar disorder and had plans to divorce Alice. Allen also testified that he loved Sally, and the evidence at trial demonstrated that he was completing his family service plan, completed parenting classes, was in counseling, regularly attended visitation with Sally, and was generally doing well prior to the October assault.

Psychologist Donald Eugene Winstead, III, prepared a psychological evaluation for Allen at the Department's request. Winstead administered the Coolidge Assessment Battery, an

12

instrument used to assess emotional and personality functions, and described Allen as "faking good . . . to present himself in an overly positive light." According to Winstead, Allen suffered abuse and neglect as a child and had "significant personality impairment[s]," like "antisocial and schizoid" personality issues, paranoid traits, and apathetic features, all of which could result in Allen having unstable relationships. Winstead also testified that Allen had a social anxiety disorder and "was generally unhappy with his life, possibly suffering some low-grade depression." Although Winstead "ha[d] no direct evidence that [Allen] ha[d] ever neglected his children," he testified that being subjected to family violence poses danger to a child's emotional well-being. He explained that a parent's "ability to teach a child how to manage and regulate emotion is impaired" when a caregiver is suffering a significant emotional issue.

Locke Curfman, a licensed professional counselor, testified that Allen was "in counseling every time the doors were opened and he was scheduled, and he was making an attempt to improve himself." However, due to the October assault, Allen's treatment plan was temporarily ceased. Curfman opined that Allen's violent behavior might continue and that witnessing domestic violence is damaging to a child's well-being.

### 2. Analysis

The evidence at trial established that Allen was aware of Alice's mental health and drug history, but had nevertheless left Sally in her care as an infant. Allen himself admitted that he had a hard time keeping Sally away from Alice while she was using methamphetamine. Although Sally was in their care for only eight weeks, the evidence showed that Allen had knowingly left

13

Sally with Alice, a person who engaged in conduct which endangered Sally's physical or emotional well-being.

The evidence at trial also established that Allen had a history of domestic violence against Alice. "A fact-finder 'can consider the history of abuse between the mother and the father for purposes of subsection[] . . . (E), even if the children are not always present.'" *Z.M.*, 456 S.W.3d at 686 (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at \*5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.)). While he knew that Alice was pregnant with Sally, Allen assaulted Alice. After Sally was born, Alice reported that Allen had choked her while he was holding the child. Even after Sally was removed from the home, reports of domestic violence continued, and there was some evidence that Allen assaulted Sally during the pendency of the case in October 2016. Although Allen was continued on community supervision, charges for the October assault were still pending at the time of trial.[7]

Allen points to evidence demonstrating that he had completed almost all of his family service plan, had never missed a visitation with Sally, had maintained stable employment as a barber, and was making progress with his individual counseling.[8] Caseworkers also testified that Allen was doing well and that his home was always an appropriate one. Allen completed alcohol

---

[7]"[I]ntentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at \*7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam)).

[8]As of August 25, 2016, the trial court found that Allen had complied with all requirements of the family service plan. However, on January 27, 2017, the trial court ruled that Allen was no longer in compliance.

and substance abuse assessments and always tested negative for drugs during the pendency of the case. Allen testified that he loved Sally and maintained that he had never harmed the child.

Yet, in termination cases, "[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005)). Based on all of the evidence introduced in this case, we conclude that a rational fact-finder could readily have reached the necessary firm conviction or belief that Allen engaged in conduct or knowingly placed Sally with persons who engaged in conduct that endangered her physical or emotional well-being. Accordingly, we find the evidence both legally and factually sufficient to support the trial court's finding of a statutory ground of termination and overrule Allen's second point of error.

## C. Sufficient Evidence Supported the Best-Interest Findings

We next turn to Allen's challenge to the trial court's best-interest finding. "There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the

15

future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016). It is not necessary to prove all of these factors as a condition precedent to parental-rights termination. *C.H.*, 89 S.W.3d at 27; *N.L.D.*, 412 S.W.3d at 819. Evidence relating to a single factor may suffice in a particular situation to support a finding that termination of parental rights is in the best interests of the child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). Further, when considering the child's best interest, we may take into account a parent's continuing criminal history, past performance, and poor judgment. *See C.H.*, 89 S.W.3d at 28; *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.).

Sally was nineteen months old at the time of trial.[9] Alice's first child, Sally's half-brother, was previously adopted by Sally's foster parents, Barbara and Chester Mooney. When Sally was removed from Alice and Allen, they requested that she be placed with the Mooneys, who also had another son. The Mooneys and Gaviria testified that Sally was a happy, generally healthy baby who had bonded with the entire family. Barbara did note that Sally has ptosis in her left eye, had a medical procedure scheduled to alleviate her drooping eyelid, and had to have tubes put in her

---

[9]Because she was too young to express her wishes, we find the first *Holley* factor to be neutral. *See In re X.L.R.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (citing *E.N.C.*, 384 S.W.3d at 808).

ears. Other than that, nothing established that Sally's emotional and physical needs differed in any respect to that of other children.[10]

The evidence at trial demonstrated that Allen had engaged in family violence assault with his paramours several times over the course of years. He had assaulted Alice once while she was pregnant with Sally, once while she was pregnant with Sally's sibling, and once while actually holding Sally. Several witnesses (including Allen) admitted that Sally could suffer emotionally if she witnessed domestic violence. The evidence at trial had also established that Alice had moved away from Allen's home several times during the pendency of this case, but had been allowed to return. The couple were still married at the time of trial, and Alice had lived with Allen as recently as a month before trial. Counselors testified that there was a risk that Allen could again commit an act of violence. The trial court, as fact-finder, could reasonably infer that there was a great likelihood that Allen and Alice's past patterns would resume in the future and could present a danger to Sally's emotional well-being if Allen's parental rights were not terminated. We find the third *Holley* factor weighs in favor of terminating Allen's parental rights.

The Mooneys, who had intervened in these proceedings, testified that they wanted to adopt Sally. Barbara opined that due to the strong bond between Sally and the Mooneys, it would be detrimental to Sally to remove her from their home. Allen agreed that the Mooneys were providing good care for Sally and that she may have bonded with them. Although Allen had completed

---

[10]"A parent's rights cannot be terminated based on poverty without a showing that the poverty has endangered the child." *See In re E.W.*, 494 S.W.3d 287, 300–01 n.13 (Tex. App.—Texarkana 2015, no pet.). The evidence established that Allen had maintained regular employment and appropriate housing and, although there was evidence Allen had difficulty paying some fees, the evidence did not establish, by clear and convincing evidence, that Sally's needs would go unmet if she were to reside with Allen.

parenting class and engaged in regular visitation with Sally and no witness testified that he had a lack of parental skills, the evidence at trial showed that Allen had failed to protect Sally while Alice used methamphetamine in her presence. This fact, coupled with evidence that Allen had choked Alice while holding Sally, supplied enough evidence for a fact-finder to determine that Allen's parental abilities were lacking. We find the fourth *Holley* factor against Allen.

Next, the Department had provided many programs to assist Allen. However, after completing BIPP, Allen assaulted Alice. Allen's community supervision officer testified that BIPP was the most advanced program for batterers and that there were no other more advanced services to offer to Allen. We find that the fifth *Holley* factor weights in favor of terminating Allen's parental rights.

As for plans to take care of Sally, the Mooneys testified that Barbara was a stay-at-home mother and planned to take care of Sally full time. They had a four bedroom home and were in a secure position to take care of Sally financially. Gaviria testified that the Mooneys' home was a safe one. On the other hand, when asked how he planned to take care of Sally while at work, Allen testified that he could "make a few phone calls" to friends. That answer could have led a fact-finder to conclude that Allen had no concrete plan for childcare. Gaviria testified that while there was no evidence that Allen's home was inappropriate, Allen's home was not a safe and stable home as a result of his violent behavior towards others. We find the sixth and seventh *Holley* factors against Allen.

Allen's history of domestic violence, failure to protect Sally from Alice, and failure in the past to secure a drug-free environment for the child indicated that Allen's existing parent-child

18

relationship was not an appropriate one. After Sally was removed from his home, Allen continued to assault Alice, even though he knew she was pregnant with another child. His counseling was placed on hold until he could "get some of the other things under control," and he failed to pay for child support although ordered to do so. Allen did not seem to have any excuses for his acts or omissions involving domestic violence. We find that the last two *Holley* factors weigh in favor of terminating Allen's parental rights.

Based on the evidence presented at trial and an examination of the *Holley* factors, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Allen's parental rights to Sally was in her best interests. Therefore, we find there is legally and factually sufficient evidence to support the trial court's best-interest finding. We overrule Allen's third point of error.

### III. The Trial Court Did Not Err in Failing to Strike the Mooneys' Petition in Intervention

Finally, Allen argues that the trial court erred in failing to strike the Mooneys' petition in intervention. "Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. We review a trial court's denial of a motion to strike intervention for an abuse of discretion. *In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.) (per curiam). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *See id*. at 829–30 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). A trial court abuses its discretion if it grants a petition in intervention when (1) the intervenors could not have brought the same action, or any part thereof, in their own names; (2) the intervention would complicate the

case by an excessive multiplication of issues; and (3) the intervention is not almost essential to effectively protect the intervenors' interest. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).

Standing to sue is only conferred on "a person who is the foster parent of a child placed by the Department of Family and Protective Services" after the child is placed "in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition." TEX. FAM. CODE ANN. § 102.003(a)(12) (West 2014). Sally was placed in the Mooneys' home on January 12, 2016. On March 8, 2017, after Sally had been placed with them for one year, the Mooneys filed a petition in intervention. Allen filed a motion to strike the petition in intervention on April 12, 2017, and the motion was heard on the day of trial. Allen did not argue that the Mooneys could not have brought the same action in their own name, that the intervention would complicate the case, or that the intervention was not almost essential to protect their interests. Instead, Allen argued only that the Mooneys' petition was untimely filed. Yet, the Mooneys had been involved in the case from the time the Department had filed its petition and had participated in discovery and mediation efforts.

Under the circumstances presented to it at the hearing, and with the child's best interests in mind, we cannot say that the trial court abused its discretion by deciding to deny Allen's motion to strike the Mooneys' intervention, which was heard right before trial. *See In re N.L.G.*, 238 S.W.3d at 831; *see also Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 218 (Tex. App.—Austin 2013, no pet.). Therefore, we overrule Allen's last point of error.

20

**IV.    Alice Failed to Preserve Any Challenge to the Trial Judge**

From the inception of this case, all hearings were held by the Honorable Rebecca Simpson, the judge of the CLL1.  During the pendency of the case, Judge Simpson retired.  On May 8, 2017, the Honorable Mary Murphy, presiding judge of the First Administrative Judicial Region, entered an order of assignment for Judge Simpson to continue to hear this case.  Alice complains that she did not have the opportunity to object to Judge Simpson.  The Department argues that Alice has failed to preserve this issue for our review.

Because "[p]reservation of error is a systemic requirement on appeal," we must first address the Department's contention.  *In re E.R.C.*, 496 S.W.3d 270, 276–77 (Tex. App.—Texarkana 2016, pet. denied) (quoting *Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009)).  "[T]he rules governing error preservation must be followed in cases involving termination of parental rights."  *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005).  Our appellate record demonstrates that Alice failed to raise any complaint with regard to Judge Simpson's assignment or her ability to continue to hear this case.  Simply put, Alice has failed to preserve her last point of error for our review.  It is overruled.

**V.    Conclusion**

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:        September 11, 2017
Date Decided:          September 20, 2017

21